Spring Term
1839.

Vernon and Averill, Trustees of Wilcox
& Lynde, *against* Morton & Smith.

CHANCERY.

The Same *against* Grigg & Elliott.

The Same *against* Desilver & Thomas.

[Messrs. Fry & Page for plaintiffs: Mr. Pirtle for defendants.]

FROM THE LOUISVILLE CHANCERY COURT.

Judge EWING delivered the Opinion of the Court.

*May* 7.

THE complainants, respectively, in these three cases, upon the return of *nulla bona* upon executions sued out on judgments obtained by each, against Willcox and Lynde, filed their bill to set aside a deed of conveyance, as fraudulent, by which they had assigned all their effects to Vernon and Averill, as trustees, for the use and benefit of their creditors.

The deed of assignment bears date the 8th of November, 1834, and is signed and sealed by Wilcox and Lynde and Vernon and Averill; and these bills were filed in May following.

The deed commences by reciting the sums due by Wilcox and Lynde, and Dickerman (formerly of the firm, and whom the two former had purchased out,) to each of twenty two creditors, amounting in the aggregate to eighteen thousand one hundred and one dollars, fourteen cents, for books, stationary &c. sold and delivered to them; and being desirous to secure them, they in substance, "transfer and assign over to Vernon and Averill, for the payment of said debts, all their effects, consisting of books, stationary, fixtures, binders' tools, notes, book accounts, as per schedule annexed, together with all the goods now in the possession of the sher-

*Three bills—filed by different creditors of the same debtors, having ex'ons returned nulla bona, to set aside a deed of trust made by a firm of traders (insolvent debtors,) assigning all their effects to trustees, for the benefit of such creditors of the grantors as may assent to the arrangement, and agree to accept shares, proportioned to their debts, of the net proceeds of the property conveyed, after indemnifying the trustees for liabilities incurred in obtaining some of the property that was under attachments, paying stipulated salaries to the trustees, compensation to their assistants, and other expenses. The conveyance was*

duly recorded; most of the creditors advised and assented to it, and all had notice of it: but the complainants refused, and, charging that, upon various grounds (*vide post*,) the conveyance is fraudulent as to them, attempt to subject the property conveyed, to their debts.—But all fraud being denied, the object appearing to be fair and equal; and there being no proof of any fraudulent intent—the conveyance is sustained.

Spring Term
1839.

*Vernon &c.*
vs
*Morton & Smith
&c.*

iff under restraining orders, which goods they intend to get out of the sheriff's hands, by giving bond as authorized by the restraining orders; to be disposed of by the said Vernon and Averill, as followeth:—

*First*—" to be taken possession of by Vernon and Averill, and sold out, at fair and reasonable prices, and to the best advantage; and the proceeds equitably distributed among the said creditors, in ratable proportions to the amount of their debts respectively; for which service, the said Vernon and Averill to receive a salary of three hundred dollars each, annually; to be paid out of the effects, and to do the business and carry out the objects of the trust, the trustees are empowered to appoint an agent and other competent clerks, and to allow them reasonable salaries, to be paid out of the effects." "And the trustees are constituted attorneys in fact, to settle and collect, sue for and recover all demands, and to give acquittances &c. and to enter as the sureties of Wilcox and Lynde, in bonds, to obtain the possession of the goods, that have been taken under six restraining orders, as well as any other restraining orders that may be issued, and to defend said suits, and to retain so much out of the proceeds of the effects, as will indemnify them."

On the same day, a counterpart to the aforesaid deed was executed by the same parties, stipulating and providing, " that if the specified creditors do not consent, within three months, and execute a deed accordingly, permitting all the other creditors not named, to come in and share *pro rata* with them, in the proceeds of the effects, provided the creditors not named shall come in within four months, and assent to the provisions of the trust, and agree to share in the proceeds *pro rata*, then, such named creditors are not to be entitled to the benefit of the trust, but the proceeds are to be divided among those who shall assent within three months, and to those not named who shall assent within four months." "And if a proportion of the creditors, holding two thirds of the amount of claims named in said deed, shall prefer a deed made immediately to themselves, transferring the trust effects, such deed is to be made, the trustees retain-

ing a sufficient portion of the effects, to indemnify themselves for all securityships and responsibilities incurred."

The answers of the trustees and of Wilcox and Lynde flatly deny the allegations of fraud, and say that the assignment was made at the instance of many of the creditors, and the agent and attorney of others, as the best thing that could be done, to do equal and impartial justice to all.

The trustees say that, they took possession of the effects, employed competent clerks, and went on to make sales of the goods and collections, until April following, when the stock being broken, and the rents and expenses very great, under the advice of many of the creditors represented by their agents, they sold out the residue of the stock to Kellog and Parker, for six thousand nine hundred and eighty two dollars—one third in cash, and one third in nine months, and one third in eighteen months; and report, at the time of filing their answer, in September, 1835, as the sum received by retail, after the assignment, $2,890 12 cents. The amount sold at retail, not then received—$3,210 87 cents; and the amount received upon the books and notes transferred—$1,637 92 cents, and expenses, rents &c. $3,665 03, and a considerable balance purporting to be owing on the books and notes, but whether collectable or not, uncertain.

They also charge that $2,350 worth of the amount of goods retailed were under attachments when assigned to them, and they obtained the possession of them by *becoming bound* to have them forthcoming, or to *pay the amount of the decrees.* And if the complainants in those suits shall succeed, the amount of effects in their hands will be reduced at least $2,400.

The Chancellor, upon the hearing decreed, that the deed of assignment and counterpart was fraudulent and void; and that the trustees pay to each of the complainants the amount of their judgments and costs, respectively, out of the proceeds of the assigned effects. And the defendants have appealed to this Court.

The exhibits and proof in the cause show that, the deed of trust and counterpart were duly recorded, and

in proper time, and the twenty two named creditors, within the time limited, some by themselves and others by their agents or those representing themselves as such, accepted the terms, contained in the second deed, or counterpart to the deed, and executed the required instrument for a *pro rata* distribution among all the creditors. And six of the creditors not named, also executed a writing assenting to the terms proposed.

And there is evidence tending to show that, all the creditors had timely notice, and that the complainants Morton and Smith were advised of the execution of the deeds, for themselves, and as agents for the two other sets of complainants, and urged to come in, but declined under the pretext of having placed their claims in the hands of a lawyer for collection.

And it is proved that the deeds were executed openly and publicly, under the advice and at the request of the agents of many of the creditors, and especially of Hamilton Smith—who was the agent and attorney of a number of the creditors in the east, holding claims to the amount of upwards of eleven thousand dollars, as proven by himself—as the most proper and equitable arrangement that could be adopted to do exact and equal justice to all, when it was ascertained that the means of the debtors were insufficient to meet all their liabilities.

From this exhibition of the facts of this record, there seems to be nothing which does not square with the strictest integrity and good faith; nothing which bears upon its face the slightest impress of fraud or unfairness. The debtors surrender *all*, openly, and at the instance, and upon the motion, of as many of their creditors, as could be consulted, so arranging the matter as to afford time and opportunity for all to come in, and share equally, without exacting any release as to the balance of their debts that should remain unsatisfied, or reserving any portion of the effects to themselves or families. A perfect equality is secured to all, if they choose to accept the terms proposed; and in case they refuse to do so, and any thing should be left after satisfying the claims of those who may accept, those who do not ac-

cept may no doubt subject that balance to the payment of their debts.

Equality is equity; and that has been done precisely which a Court of equity would do, if the whole fund was under its control, and all the creditors were parties, seeking a satisfaction of their debts.

It has been frequently settled, that a debtor may prefer and assign over his effects to a favorite class of creditors—provided he do it in good faith. *Brooks* vs. *Marbury*, 6 *Cond. R.* 234, *and note; Kent's Com.* 533–4–5–6. If so, much more may he assign over his effects to trustees for the use of all, providing such terms as will secure to each and all of them, an equal *pro rata* participation in the avails.

In the first case, there is inequality and apparent injustice; but the right has been sanctioned on the principle of the owner's perfect dominion over his own property, if there be no lien or other legal impediment in the way. In the other case, there is perfect equality, impartiality and justice; and it would require a strong case, to induce this Court, sitting as chancellors, to disturb an arrangement, so equal and just, especially, at the instance of creditors, who are seeking to appropriate *all* to their own use, at the expense and total exclusion of all others, equally meritorious with themselves, and, after, as in this case, they had the opportunity afforded them, and were urged to come in to the equitable terms proposed.

Nor can we perceive any thing wrong in the allowance of a reasonable compensation to the trustees, for their trouble and responsibility; or in allowing them to employ agents and clerks to attend to the sales and collections, and to carry out the objects of the trust. The mode was suggested and assented to by many of the creditors, by their agents, as the best that could be adopted, to prevent a sacrifice, by a speedy sale at auction. And it is clearly shown that, if such a sale had been made, that it must have resulted in an enormous sacrifice, to the manifest injury of debtors and creditors. ors as an agent in managing the business—the trustees being responsible for his acts.

Spring Term. 1839.

*Vernon* &c.
vs
*Morton & Smith &c.*

Assignments by debtors for the benefit of *preferred* creditors hav been held good; & an assignment by a debtor of all his effects for the benefit of all his creditors, or those of them who shall agree to a *pro rata* distribution, is unquestionably valid.

A stipulation in the deed of trust, made by insolvent debtors, for the benefit of their creditors; that salaries shall be paid to the trustees out of the trust property, and that they may employ agents, and pay them out of the proceeds, is neither indicative of fraud, nor improper. Nor is the employment of one of the grant-

Spring Term
1839.

*Vernon &c.*
vs
*Morton & Smith
&c.*

Nor can we perceive any thing improper in the employment of one of the debtors to assist in the sales as agent and clerk, under the superintendance of the trustees, they being held responsible, as they would unquestionably be, for a faithful disposition of the trust effects.

The debtor so employed, it must be presumed, would be better acquainted with the books and state of the business; and therefore capable of affording assistance and advice, which might be essential, and not attainable from any other source. It does not appear that an unusual or unfair allowance was made him; or that he was permitted, or did appropriate any of the effects to his own use; and if such were the case, with the knowledge of the trustees, or if they, in the discharge of the fiducial duties confided to them, in any other respect, misapplied the trust effects, or permitted others to do so, they might be made personally responsible to creditors, and, perhaps, as well to those who did not come in, as to those who did, if by a faithful disposition of the effects, a balance would have been left, after satisfying the claims of the assenting creditors.

Goods were attached by a ch. order—to be restored to the defts. upon their giving bond, with security,to have them forthcoming, or pay the decree. The defts. afterwards, assigned all their effects, including those goods, to trustees, who stipulated to give the required bond, & pay the decree(if any,) out of the proceeds of the goods: there was no impropriety, or evidence of fraud in the conveyance, in this arrangement.— Nor in authorizing the trustees to defend the attachment suits,

Nor can we perceive any thing improper in embracing in the assignment, the goods attached under restraining orders out of chancery; nor in making *provision to procure security, to obtain the release* of those goods; nor in providing for the defence of those suits. The orders authorized their restoration to the debtors, upon their giving the necessary security for their return, or the *payment* of the decrees that might be rendered; and the debtors in their failing condition could not be expected to obtain a friend to become bound for them, without providing for his indemnity. *It would seem perfectly* allowable for them to make provision out of their effects for his indemnity.

And though the debts set up in those suits, were acknowledged to be just, it was surely competent for them to question the jurisdiction of the Chancellor, in the state of case exhibited, and to provide the means and pay the expenses out of the assigned effects. And, tho' the debts for which the goods were attached, were admitted to be just, the trustees might well question the jurisdiction of the Chancellor, or the validity of the proceeding, without subjecting themselves to a charge of bad faith, or their deed to the imputation of fraud. See the Petition and Response, *post.*

to defend the suits, without subjecting themselves to the imputation of bad faith, or their assignment to the charge of fraud.

Nor can we concur with the Chancellor in the opinion, that the proof is not sufficient to sustain the consideration of the assignment. The debtors long before any equity attached in favor of the complainants, not only acknowledged, on the face of the deed, the amount of their indebtedness and to whom, but it is proven that some short time before the assignment, they had made large purchases in the east on credit; and is also proven by Smith, that he had obtained from that quarter, and had under his management and control, for collection, an amount of claims exceeding eleven thousand dollars, in behalf of creditors whose names he had signed to the instrument, assenting to the terms of the assignment. These facts should surely amount to *prima facie* evidence of the subsistence and justice of their claims, which should be permitted to stand until counteracted by other proof, and especially as to the amount proven by Smith. Besides the covenant in the deed, on the part of the trustees, to become bound as the sureties of the debtors, (which they performed by entering into the bonds accordingly) is of itself a valuable consideration, independent of the debts due to the trustees themselves.

Nor do we concur with the Chancellor, in the conclusion to which he has arrived, as to the existence of fraud, from the fact of one of the assignors having been continued in the store as agent or clerk.

Though this Court has yielded to the ancient doctrine founded on Twine's case, that, in absolute sales of chattels, a continuance of possession by the vendor, is *per se* fraudulent, they have never applied that doctrine to mortgages or deeds of trust. But, on the contrary, have, in many cases, excepted from the operation of that rule, such transfers or conveyances. *Mc Gowan* vs. *Hoy,* 5 *Lit. R.* 243; *Bucklin* vs. *Thompson,* 1 *J. J. Marshall,* 226; *same,* 282; 3 *J. J. Marsh.* 653. And in the case of the *U. S.* vs. *Hooe,* 1 *Con. R. U. S.* a similar distinction was taken between a mortgage and absolute sale. And

Spring Term
1839.

Vernon &c.
vs.
Morton & Smith
&c.

Facts held to be sufficient evidence, *prima facie,* of a good consideration for a deed of trust, made for the benefit of the grantors' creditors.— Securityship undertaken by the trustees, to obtain part of the goods that were attached, would alone constitute a valuable consideration.

The possession of chattels retained by the vendor after *an absolute sale,* is *per se,* evidence of fraud. But this principle does not apply to mortgages, or deeds of trust.— And where one of a firm who had assigned their effects to trustees for the benefit of their creditors, was retained by the trustees to aid them in executing the trust, and so remained in possession of the goods conveyed—such continued possession is held to be no evidence of fraud.

Spring Term
1839.

*Vernon &c.*
vs
*Morton & Smith
&c.*

Where it is consistent with the terms and object of a sale of goods, that the vendor shall remain in possession — his possession is not conclusive evidence of fraud; tho' it is a fact from which fraud may be inferred; or, which may, on the other hand, be shown to be consistent with good faith.

the same distinction is admitted in many of the later decisions of the English Courts.

If the possession is consistent with the terms and object of the deed, it is not deemed intraversable, legal fraud; but it is admitted to be a circumstance from which fraud may be inferred, susceptible of being counteracted by proof, and explained or reconciled with honesty and fair dealing.

The nature, object and character of the possession, is fully explained in this case, and may stand consistent with perfect fairness.

The deed authorized and required the appointment of an agent and clerks by the trustees, to carry out the objects of the trust. The deed was made publicly, under the advice of the creditors, and placed upon the records of the County Court, for the inspection of all; the superintendence of the assigned effects taken by the trustees, and one of the debtors selected, under the powers conferred by the deed, as agent or clerk, to assist in making sales of the goods; and the character in which he acted, well known to all who felt any interest in knowing, and no attempt is made to prove the slightest departure, in the disposition of the effects, from the strictest integrity. We can perceive nothing in these circumstances to brand the transaction with the condemnation of fraud.

Upon the whole, we are perfectly satisfied, that the deed of assignment should be sustained.

Creditors who have filed bills to set aside a deed of trust, and sub ject the effects conveyed, to their debts, and have failed in that object—the deed being valid, may have the benefit of *the surplus* after the claims provided for in the deed, are satisfied. But where it is obvious that there is no surplus, their bills may be dismissed at once.

But, though the complainants refused to assent to the terms of the assignment, and to come into a ratable division, yet if there should be any surplus after the payment of the claims of those who did assent, and all other liens upon the trust effects, they, as general creditors, would have a right to subject the surplus to the payment of their demands. *Brashears* vs. *West*, 7 *Peters*, 608; 6 *Cond. R.* note, 235. And if there were any probability that the proceeds of the effects would more than pay the claims of the assenting creditors, and other liens upon them, we should direct the cause to be retained to ascertain the result, and grant relief to that extent, under the general prayer. But as it is evident that there will be no surplus, but the proceeds must fall far short

of discharging the other claims upon them, it will avail Spring Term 1839.

Vernon &c. vs Morton & Smith &c.

nothing to tie up the effects longer.

It is therefore, the opinion of the Court, that the decree of the Chancellor be reversed, and cause remanded, that the complainants' bills in the three cases, respectively, be dismissed with costs, and the appellants are entitled to their costs in this Court.

PETITION FOR A RE-HEARING.

[By Mr. Pirtle.]                                                                  June 3.

THESE are cases of great importance to the country. A full decision on the subject of deeds of assignment, has not heretofore been made by this Court. It seems to me, that no deed of this kind should be sustained, unless it devote the property conveyed, untrammelled, wholly and directly to the payment of debts. No other purpose should be allowed to creep into the deed. If this deed shall be sent forth bearing the commendation of this Court, with great respect for this high tribunal, I humbly think, that a debtor who had "*intent or purpose to delay, hinder or defraud creditors of their just and lawful actions, suits, debts, accounts*" &c. withdraw his property from the reach of execution, and secure a good salary for himself in administering on his own effects, could not wish a better precedent or *formula* for such business.

Feeling a full conviction that such is the character of this deed, and that such would be the result, I cannot forbear, most respectfully, to ask the Court for a re-hearing.

Wilcox, Dickerman & Co. had been in business but a few months, when, after sacrificing at auction in different parts of the country, a large quantity of goods, and filling their pockets with money, (see the depositions of Fabrique and Rice,) they commenced the operation of putting their goods beyond the reach of the law, by selling out to a young clerk in the store without money or any means to pay, and of "unsteady habits." After having carried on this farce of doing business in his name, at the same place, for about two months, and find-

ing that this scheme was too shallow; when the actions at law of the complainants, had been brought, and six other suits had been instituted by other creditors, and part of the goods attached in those suits, the plan of this deed was invented. This deed recites, that they were indebted to divers persons whose names are set forth in the instrument; but whether they were so indebted does not appear by any proof in the cause, although this matter is drawn in question by the different bills. It is true, there is proof that Wilcox, Dickerman & Co. were indebted to persons in the east, but it is not proved that they were indebted to these persons; nor are the amounts proved. Their word, then, only, is to be taken to show that the persons, whose counsel expressed a willingness that this deed should be made, and who were so far parties to the transaction, were creditors at all; and for the sums set down to them. The proof of indebtedness eastward, applies as well to the appellees, and to the six suits in chancery, as to the persons named in this deed. In truth, as these are the only persons shown to be creditors, it applies to them only.

Then, with the counsel of them who are said to be creditors, this deed is constructed, and the conveyance of all the property of the debtors is made to Vernon and Averill, compelling those creditors who had brought suits, to dismiss them, and come under the terms of the deed, or lose their debts altogether—and more; it provides especially for the defeat (not merely the delay) of the six suits in chancery commenced to enforce just debts. It is respectfully insisted, that this last mentioned provision does destroy the instrument *ipso facto*. The Court has said it was competent to provide the means to defend the suits on the question of jurisdiction of the Court. Why should the party sued be allowed to take upon himself to say whether the Court had jurisdiction or not? The Judge, the competent authority of the country, had decided that there was jurisdiction, and had awarded the restraining orders. If his judgment, set up against the organ of the law, can excuse him from the imputation of hindering and delaying creditors, then any one may release his property by the like deed from

any attachment, and with impunity, and with judicial sanction, too, provide that his property shall be expended *in the discretion* of trustees to resist the law, coerce creditors to abandon their "lawful suits," and come into terms which may place all on equal grounds as to what shall be distributed to them. The impropriety of this liberty to the party to decide upon the jurisdiction of the Court, has been fully exemplified in these six cases: for, in truth, upon a hearing had, some time since, the Chancellor decided that the Court of Equity had jurisdiction, and granted the prayers of the bills. In the case of *Mackie* vs. *Cairns*, 1 *Hopk. Rep.* 373, the deed of trust provided—"That if any of the creditors of the said William Cairns should have made any attachment of any property or debts theretofore belonging to him, which he had theretofore or by that assignment, assigned for the payment of his debts, such creditor should be excluded from all interest in any dividend, unless he should, previous to making the dividend which he might desire to accept, give up the attachment." The Court of Chancery of New York, in reference to this clause, said—"This provision is clearly illegal, and vitiates the instrument which contains it. When a debtor thus transfers his property upon the condition that his creditors who are pursuing their legal remedies, shall relinquish those remedies, such a transfer is plainly made to coerce the pursuing creditors; it directly impedes the course of law and justice; and it must be void." Page 404.

But the terms upon which the parties who had sued at law, as well as those who had sued in chancery, should give up their suits and abide by the division to be made among them, are not just—if equal, not equitable or lawful. It is contemplated to stop the course of justice and place the property and effects of the debtors in the hands of others to be disposed of in an indefinite time—"to conduct said business," says the deed: "the retail business" says the answer: and for which "the said Vernon and Averill shall each receive *a salary* at the rate of five hundred dollars a year so long as they shall act, to be paid out of the effects hereby assigned."

VIII. 33

(In the transcript it is written *three* hundred, I have examined the original filed in the office of the Chancery Court, and know that it reads "*five*" hundred, and I would ask for a *certiorari* if it could have any effect in the cause.) Not content with having laid out the conduct of the business by the year, or more, or less, the deed provides also, that they are authorized to appoint "an agent to conduct the business" under their supervision, and to pay him such *salary* as shall in their opinion be an adequate compensation for the services rendered, out of the property hereby assigned them, and to employ such other clerks as shall be necessary to *carry on the business*, and pay them such *salaries* as they may deem just and right, out of the said property or its avails." This is truly a deed of "*hire and salary*;" not for the benefit of creditors.

The sum to be appropriated to resist the honest creditors in their six suits respectively, before mentioned, is to be under the discretion of the trustees. Can such provisions for carrying on the business, wasting the goods in salaries upon salaries—some of them in discretion—paying out sums at discretion, to defeat law suits justly instituted, be lawful and equitable terms, which creditors should be bound to accept, or lose their just demands? The counterpart of the deed makes it depend expressly upon the condition that the creditors shall "consent to the provisions thereof." And the counterpart goes on to say, "that if a proportion of the creditors holding two thirds of the amount of claims named in said deed of trust, shall prefer a deed made immediately to themselves, then the deed aforesaid, of even date herewith, shall be delivered to the said Wilcox and Lynde, on their executing and delivering another deed to the said creditors (which said Wilcox and Lynde hereby obligate themselves to do, if required by said creditors, in the propertion as aforesaid,) immediately for said property, debts &c. which were conveyed by deed of this date." Now, here is no provision whatever that those two thirds of the persons they call creditors, should hold the property, thus to be conveyed to them, in trust; nor is there one word that implies a trust

for the payment of debts. This is the whole provision. And yet this is one of the terms that must be also submitted to. But, admitting that there is a trust implied, who are to be the trustees? When will they make themselves known? When will they take the deed to themselves? Where will they reside, and to what place will they carry the property? They are persons living in distant States, it appears, out of the control of the nine sets of creditors who had sued, and beyond the control of the Courts of this State. Surely such a provision as this is not fair, equitable, just and lawful; such as does not 'hinder or delay' creditors in their lawful suits. If this can be done, then creditors who have instituted suits must give them up, although they may not know what is to become of the debtor's property, except that they must see it is not all—that a great portion of it is not—to be devoted to the payment of his debts. To say the best of this provision, it is putting the debtor's property out of his hands for a time—placing it in a kind of abeyance, not to be touched by his creditors, either by execution or otherwise. Is not this delay? Does it not "hinder lawful actions, suits &c." in the language of the statute? 1 *Stat. Law*, 737. If the deed is impeachable for any of the objections mentioned; if it is void by the statute, in any part, it is void for the whole. See *Mackie* vs. *Cairns, Hopk. Rep.* before cited, and the same case in the Court of Errors, 5 *Cowen's Rep.* 580. This, upon a full view of all the cases, is now held to be the true doctrine in New York: such is the ancient doctrine; 3 *Co. Rep.* 78; *Plowd.* 54; *Wimbish* vs. *Tailbois, Hob.* 14; *Norton* vs. *Simmes; Hyslop* vs. *Clark*, 14 *Johns. Rep.* 458. The case of *Murray* vs. *Riggs* intimated the contrary, because the Court of Chancery could superintend, and see that justice was done in despite of the deed; but that case has been overruled by the cases *Mackie* vs. *Cairns*, and *Grover* vs. *Wakeman*, 11 *Wend. Rep.* 187.

But the facts which appear in this case outside of the deed, show it to be fraudulent. The grantors had been sacrificing their goods and filling their coffers with money, instead of paying their debts. They had just be-

Spring Term 1839.

Vernon &c.
vs
Morton & Smith
&c.

Spring Term
1839.
Vernon &c.
vs
Morton & Smith
&c.

fore this transaction made a most palpably fraudulent sale of their whole stock to Townsend, their clerk, which was well known to the trustees, and from which device the debtors were driven by a portion of the creditors. Having provided good salaries, they were determined to be availed of them; and accordingly Lynde, one of the grantors, kept the possession of the store as usual, and carried on the business of retailing goods, and collecting debts, as theretofore—the trustees were not seen to do any thing. The answer says, " the sum received by retail after the conveyance, up to this time, (7th September, 1835,) is $2,890 12. The amount sold at retail not yet received, is $3,210 87. The amount received upon the books and notes transferred by the conveyance, is $1,637 92. Expenses incurred are $3,665 03."

The residue of the goods, after having carried on the retail business from the 8th of November, 1834, until some time in April, 1835, were sold to Kellogg and Parker: so that this round sum, called so briefly, ' *expenses*,' is made up of the good sums paid to Mr. Lynde, the grantor, and his clerks for their *salaries*; rent for that short time, included! When did the debtor make as much money off the same capital? No doubt it was much more profitable to him than any other previous time of the short business of Wilcox, Dickerman & Co. If such things can be done, men have a ready mode, furnished at hand, by the form of this deed, to make money when they stop payment; provided they have any stock left from the auction hammer which they have set upon it themselves. How easy is it, when men find that a fraudulent deed they have made, is not regarded by a portion of their creditors, who have brought suits for their debts, to cancel that deed, and to convince a portion of their other creditors that a conveyance like this will yield them about as much as they, if they sued, could get by law, at any rate, and persuade them to assent to such a deed. When self-interest is operating; when there is talk of the sacrifice of property; when an equal distribution is preferred—it is not difficult to convince friends, who are to have *a good salary*, that no fraud is intended, although the distribution may be tram-

melled with salaries, useless expenses, and squanderings of the fund, and terms and conditions, such as are seen in this transaction. The way to defraud creditors is easily opened, and nothing but a close standing by the statute, the words of which I have quoted in the first paragraph of this petition, will keep it shut. The form of this deed will suit the most corrupt agreement—will stay all lawsuits against a debtor, keep him in possession of his property, pay his friends for being his trustees, and keep his pockets filled with the proceeds of his effects. The denial of fraud in the answer, amounts to nothing, if circumstances appear which show the deed should not be sanctioned by the law. *Res ipsa loquitur.* When did either of your Honors, in your experience at the bar or on the bench, ever know any party to a deed, acknowledge it to have been made in fraud? The law does not depend on the moral perceptions of the parties. Fraud in such cases is a question of law upon the facts, or it is a mixed question of law and fact. See 7 *Cowen's Rep.* 301, *Jackson* vs. *Mather.* There must be some certain standard and test on the subject of these deeds. The denial in the answer was disregarded in the case of *Grover* vs. *Wakeman,* 11 *Wend. Rep.* 225. That a sacrifice of the property would have been made, had the goods been sold under execution, and that a greater amount of debt would be paid by the disposal of the property in this way, will not justify the deed. If this be so, why did this Honorable Court, in the cases of *Ward &c.* vs. *Trotter &c.* 3 *Mon.* 1, and *Bucklin* vs. *Thompson,* 1 *J. J. Marsh.* 223, say, that, if it appeared upon the deed, that besides the intention to secure the payment of debts, the intention to prevent the creditors from sacrificing the property at their discretion, "by having it taken and sold under execution, in satisfaction of their debts, which it was lawful for them to do," also appeared, this vitiated the deed. In the case of *Ward &c.* vs. *Trotter &c.* the answers denied the fraud, and there were no depositions on that subject. In one clause the deed said, the transfer was made " to prevent a *sacrifice of his property,* which he deems ample for the payment of his debts;" and after having provided for the

payment of the debts, it remarked, " which (the deed) is expressly made and designed to secure the payment of his debts with said property, and avoid its sacrifice at the discretion of his creditors." And this is every intimation in the case from which the intention to contravene the statute could be, or was pretended to be, inferred; yet, for this, the deed was rejected. In the case of Bucklin vs. Thompson, the report says—" These depositions also state that the mortgage to Carneal was made *bona fide*, and was designed to secure the property from being sacrificed by creditors, and by giving James Johnson (the grantor) the use of it, exempt from forced sales by execution, to enable him to appropriate it and its profits most advantageously to the payment of debts; and that these mortgages had enabled him to pay at least fifty thousand dollars more than he could have paid without the protection and facilities afforded by them;" yet this good object, of paying fifty thousand dollars more of debt, did not justify the deed in the absence of any proof of direct fraud. If the facts, that a great sacrifice has been prevented, and that a much larger amount of debt has consequently been paid, or may be paid, shall exempt a deed from the imputation of hindering and delaying " creditors of their just and lawful actions, suits, debts" &c. then, let the intention to do this which is right, appear on the deed, by all means. But if the law does not deem these things an excuse, what difference can it make whether the intention appears on the face of the deed, or otherwise in the cause?

Can any one doubt but that, in this case, the intention among other things, was to hinder the nine sets of creditors who had brought their suits? They relied on the law, to which they had appealed, instead of this deed, not providing all the property directly for the payment of debts. The object was to destroy their remedy, while benefit was made to the grantors and their friends.

It is respectfully insisted that the bills should not be dismissed, at any rate. The persons who are barely called creditors, but as to whose debts, it is contended there is no proof, do not stand on equal ground, as to the establishment of their debts, with those who have judg-

ments and executions. Their deeds of acceptance of the trust are executed without the competent proof of any authority on the part of the persons calling themselves agents. The bills are for general relief. There is an amount of effects still behind, according to the answer of the trustees. They have covered over by the general expression "expenses," $3,665 05. What are they; lawful or not? Why might not an account be ordered of these matters of expense and outstanding debts, before the master, and relief granted, if relief should be proper upon the state of fact that may appear.

But I rely on the great principles involved, and ask for full relief.

*Henry Pirtle.*

<div style="text-align: right">

Spring Term
**1 8 3 9.**
*Vernon* &c.
vs
*Morton* & *Smith*
&c.

</div>

### RESPONSE TO THE PETITION.

[By Judge Ewing.]

<div style="text-align: right">June 15.</div>

THE views presented in the petition, though plausible, have not changed the opinion of the Court; nor can we believe that a re-argument will have that effect.

We readily concede, that if the intention in the execution of a deed, be to hinder and delay creditors, that such intention entering into, and producing its execution, being against the statute and bad, will vitiate the whole deed, though it be made upon a good consideration, or for the just and equitable purpose of securing an equal distribution of the effects among all the creditors. But such bad motive or intention must be made to appear by proof, and not be left to rest upon suspicion or conjecture only. When the consideration is good, and the terms equal and just, the Chancellor conveyance, a Chancellor should not imply a bad motive, upon slight grounds.

<div style="text-align: right; font-style: italic">

If *the intent* of a deed is to hinder and delay creditors, it is against the statute and void, tho' made upon a good consideration, or for the equitable purpose of an equal distribution of an insolvent grantor's effects among his creditors. But to defeat the deed the fraudulent intent must *be proved:* it is not enough that it may be suspected. And if a good consideration, and an object apparently just, appear in a

</div>

Where it appears on the face of a deed of trust, that the object of it is to *prevent a sacrifice of a* debtor's property, that shows an intention to obstruct creditors in subjecting the property to their debts, and the deed is, *ipso facto,* invalid. So, also, if the same facts are established by proof *aliunde.*

Where the apparent purpose of a deed of trust was to secure a just distribution of the grantors' effects among their creditors; and the trustees, being authorized to employ agents to assist them, retained one of the grantors for that purpose, the fair inference is—not that the deed was made for the purpose of securing to him a profiatble employment—but *bona fide* for the avowed object—especially when the deed was made at the instance of several of the creditors.

Spring Term
1839.

Vernon &c.
vs
Morton & Smith
&c.

should not, upon slight grounds, imply a bad motive. When it appears on the face of a deed of trust, that the motive for making it, was to *prevent a sacrifice* of the property, a bad motive is shown—a motive *to obstruct* the ordinary process of law in the subjection of the property to the payment of debts, which vitiates the whole deed. So, if that motive and intention be proved *aliunde*. In the case before us, the bad motive or intention is not apparent on the face of the deed; nor is it proved out of the deed. The counsel for the defendants infers that the motive and intention was to withdraw the property from the action of the law, and provide " salaries for friends, and a comfortable support for the debtors." We infer that the motive and intention was to do equal justice to all of his creditors; and charity would authorize the inference of the Court. It could not be expected that the trustees would take upon themselves the trouble and responsibilities of the trust, without some compensation, and it does not appear in proof, that the salaries allowed were unreasonable. Nor does it appear what compensation was paid to Lynde, or that it was unreasonable, or that he misapplied the funds. Nor has it been shown in proof that the *trustees misapplied them; and if they did,* by themselves or agents, they are responsible. Nor does it appear in proof, that salaries for friends, or provision for the debtors, *entered* into the *motive* or *intention* of the parties, in the execution of the deed, further than as a just compensation for services to be rendered in carrying out the objects of the trust, with most advantage to *all* the creditors. And any inference that any other intention existed, is repelled by the proof, that the deeds were made at the instance of some of the creditors, and by the counsel and direction, and under the special superintendance, of an attorney, who had the possession and control, for collection, of much the largest amount of all the claims due. The inference deduced by the counsel as to the object and intention of the deed, is not only unauthorized by the facts proven, but would impute to the attorney a faithless, if not corrupt,

disregard of the interest of the clients, whose claims had been entrusted to him for collection.

Nor can the provision which is made in the deed, out of the effects assigned, for the payment of the expenses of *defending* the attachments, or for the indemnity of friends who were to become bound for them, be deemed vicious.

Every man has an unquestionable right to make defence to any suit which may be brought against him. And the right is as unquestionable where it is made to the remedy sought, the mode and form of proceeding, or jurisdiction of the Court, as to the merits of the controversy. In making defence, expenses must be incurred, and those expenses must be paid out of the *means* which the debtor possesses. To say that the application of any of the means of the debtor to that object, is fraudulent and void, would be virtually to deny him the *right* of defence.

Nor can this right be made to depend upon, or be impaired, or the fair and honest assignment of a portion of his effects to such an object be rendered fraudulent, by the subsequent determination of the Court against his defence. If so, the transfer of a horse, or the payment of a suit of clothes, to a lawyer for his fees, in making the defence, would be fraudulent, and especially if the Court happened to decide against the defence which is set up. The assignment for this object, like all other assignments upon good consideration, must be left to depend, for its validity, upon the *motive* and *intention* of the party in making it; which is to be established as a *fact*, and cannot be deduced from the determination of the Court upon a question of law against the validity of his defence, about which an honest diversity of opinion may exist, even among lawyers, and more especially among those who have never made the law their study. By a defence, a creditor may be hindered and delayed in the speedy collection of his debt, but it is a hindrance and delay incident to the exercise of a right, on the part of a debtor, and in the course of the administration of justice; which cannot be imputed to the defendant as fraudulent, without proof.

VIII. 34

Any man may defend himself if sued; and where failing traders assigned all their effects for the benefit of their creditors, and authorized the trustees to defend certain attachment suits, that had been instituted against them, no inference of fraud arises from the fact that the trustees were authorized to pay the expenses of defending out of the assigned effects—the debtor's only means. Nor does the fact that the defence proved unavailing, make any difference.

Spring Term
1839.

*Vernon &c.*
vs
*Morton & Smith
&c.*

The suretyship undertaken by the trustees, a good consideration to uphold the deed of trust in this case.

We have no doubt of the validity of the assignment, for the indemnification of the sureties of the debtors in the bonds executed under the orders of the Chancellor. The bonds were executed to secure the very debts, the collection of which the defendants are charged specially, with the intention to hinder and delay by the assignment. The undertaking by the sureties is to have the attached goods forthcoming, to abide the decree, or to *pay* and *satisfy* the *same*. It was, therefore, surely not wrong to execute them, and, if so, not wrong but strictly right and proper to secure those who became bound as sureties, by the assignment of the attached effects, or any others in trust to them. Such assignment must be deemed, from aught that appears, for a fair and legitimate purpose, and upon a good and valuable consideration. And the assignment, so far from imposing any unequal or unjust terms or restrictions upon the attaching creditors, actually provides the means of securing them, in case they are successful in the prosecution of their suits. The case of *Mackie* vs. *Cairns*, 1 *Hopkins*, 373, has no application to the facts in this case.

A conveyance apparently valid, cannot be deemed fraudulent, merely because the same grantors had previously made a conveyance of the same property, which was abandoned as fraudulent and void.

Nor can we sanction the doctrine intimated, that, because Wilcox and Lynde made an unsuccessful effort to convey away their property fraudulently to Townsend, that every subsequent conveyance from this fact must be presumed to be fraudulent, however fair it may be shown to be.

The provision in a deed of trust, made for the benefit of creditors, that if two thirds of them concurred in desiring it, the deed should be cancelled, and one made to themselves directly, is an evidence of fairness, rather than of fraud, in the deed.

The provision in the deed for the conveyance of the effects *directly* to the assenting creditors, it seems to us was perfectly fair, equal and warrantable.

It was inserted, no doubt, upon the anticipation that the creditors generally would come in and assent to the provisions of the deed. And which might well have been presumed, as it enabled them to take their ratable share of the proceeds, and left them still at liberty to pursue their legal remedies for the coercion of the balance of their debts. And in case they did come in, it was known that the value of the assigned effects would fall far short of the amount of their debts; and that being the case, the debtors were willing to assign *all* to them, to be managed by themselves, and the proceeds

divided ratably, among them, in satisfaction of so much of their debts. They were left at liberty to consult their own interest as to the best mode to be adopted for making the most out of the effects; and it was to be presumed that they would adopt the best course, as, at best, they would fall far short of satisfying their debts.

Spring Term
1839.
Vernon &c.
vs
Morton & Smith
&c.

And whether they took the goods to Philadelphia, or the Moon, to make sale of them, was a matter with themselves, and could surely not furnish grounds for imputing fraud to the assignors, no more than if a horse or slave or any other property was transferred to a creditor to go towards the payment of his debt. And it has turned out that the amount of the debts of those who have come in greatly exceed the value of the effects.

There is nothing in the objection that, the terms of the deed of assignment have been accepted and assented to by the attorney of a part of the creditors, who had in charge the collection of their debts. The acceptance is for the benefit of the clients, and it will be presumed has been sanctioned by them, if it could not be regarded as within the legitimate powers of the attorney, in the discharge of the trust confided to him. It secures the payment of a part of their debts, and divests them of no right to pursue their remedies for the residue.

*The assent of creditors to a deed of trust made by their debtor, for their benefit, may be given by the attorney holding their claims: for if the act be not within the scope of his authority, it may be inferred that they sanctioned what was thus for their benefit.*

This provision in the deed for the assignment of the effects to the creditors, so far from bearing on its face the impress of fraud, is another strong evidence that the intention was not to provide "salaries for friends" or "a provision for the debtors" in the mode of assignment adopted. For so soon as two thirds of the assenting creditors concurred, the assignment is to be made to them directly. And they would soon concur if they found it to their interest to do so. And so soon as they did, the duties and responsibilities of the trustees would cease, and with them " their salaries" and the " comfortable provision for the debtors." We intend only to assert the proposition that, the record does not present a case which will warrant the inference of a fraudulent intent in the execution of the deed, in opposition to the

Spring Term
1839.

opposing circumstances of fairness and equality exhibited in the proof.

From the facts shown in the record, we think there is no ground for retaining the bills longer. To do so, from our view of the record, would be to encourage the procrastination of litigation, without benefit to the complainants below, and with injury to the assenting creditors.

The petition is therefore overruled.