CASE 63—PETITION EQUITY—DECEMBER 17.

# Bank of Commerce v. Payne, Viley & Co., &c.

APPEAL FROM LOUISVILLE LAW AND EQUITY COURT.

1. ATTACHMENTS.—Where a debtor's departure from the county of his residence for the purpose of avoiding arrest to answer a criminal charge has the *effect* to prevent the service of summons to answer in a civil action for the same wrong, the creditor is entitled to an attachment against his property upon the ground that he "has left the county of his residence to avoid the service of a summons."

2. SAME.—Where a debtor, for his own benefit, without consent of the creditor, has disposed of goods for which warehouse receipts have been issued and delivered as collateral security for money borrowed, an attachment may be issued against his property upon the ground that he has disposed of his property "with the fraudulent intent to cheat, hinder and delay his creditors."

3. SAME—EXEMPTIONS.—An assignee for the benefit of creditors did not acquire by the deed of assignment any interest in, or control over, property of the debtor which was exempt from execution and expressly excepted from the conveyance, and the debtor having failed to assert any claim to such property or its proceeds in this action in which it was sought to be subjected under an attachment, the court should have applied the proceeds to the debts of the plaintiff, the only other party having any claim to the fund.

4. A DEED OF ASSIGNMENT FOR THE BENEFIT OF CREDITORS is not rendered invalid by the failure of the assignee to take the oath and execute the bond required by the statute.

5. WHERE THE FIDELITY TRUST AND SAFETY VAULT COMPANY IS MADE AN ASSIGNEE for the benefit of creditors, the county court may, in its discretion, require the company at the time the bond is executed to give personal security, or may dispense with it, and in either case the instrument is good as a statutory bond.

6. THE INTENT WITH WHICH A DEED OF ASSIGNMENT FOR THE BENEFIT OF CREDITORS IS MADE, and not the actual tendency or effect of the deed, determines the question whether or not it is fraudulent and void. Therefore, if it be a trick or contrivance for the debtor's own advantage, an equal and honest distribution of his estate among his creditors being a *secondary and subordinate* consideration, or part of a plan or scheme previously concocted, in pursuance of which creditors are intended to be, or *have been*, deceived into false security, overreached and defrauded, then the deed should be held void.

Bank of Commerce v. Payne, Viley & Co., &c.

As the deed of assignment attacked in this case was executed, not in good faith and with intent to deal fairly and justly by creditors, but in furtherance, and as part, of a scheme devised by the debtors to obtain an advantageous settlement and get possession of and destroy certain outstanding warehouse receipts, which were evidence of their criminal violation of law, in the accomplishment of which purpose they had already deceived, defrauded and wronged their creditors, the deed is set aside as fraudulent and void, although the effect is to prefer an attaching creditor to the exclusion of other creditors.

7. ESTOPPEL.—The fact that the president of a bank, one of the creditors of the grantors, was present at a creditors' meeting and assented to a resolution requesting the assignee to proceed to collect and apply the property conveyed to pay the debts, does not, in view of the short time that had elapsed since the execution of the deed, and the conduct of the grantors, of which the creditors were not then fully advised, estop the bank from questioning the validity of the deed.

8. AN ASSIGNEE FOR THE BENEFIT OF CREDITORS IS NOT A PURCHASER FOR VALUE, and, therefore, it is not necessary, in order to render the deed of assignment invalid, that the assignee or the beneficiaries should have participated in the fraud of the grantors.

9. THE PLAINTIFF WAS ENTITLED TO PERSONAL JUDGMENT for the debt sued on, although there had been no actual service of summons, the defendants, by counsel, having filed an answer, in which they did not controvert the plaintiff's claim. It was, therefore, error to dismiss the petition, whether or not the grounds of attachment were sustained.

ALEX. P. HUMPHREY, W. O. & J. L. DODD AND CHARLES S. GRUBBS FOR APPELLANT.

1. A deed of assignment purporting to be for the benefit of creditors is within the statute, and fraudulent, where the intention to hinder or delay creditors *influenced in whole or in part* the assignor in making the deed. It is not the fact of delay, but its character and the motive which actuated it, that is deemed fraudulent in law. (Lyne v. Bank of Kentucky, 5 J. J. Mar., 554; Lowry v. Fisher, 2 Bush, 76; Vernon v. Morton, 8 Dana 263; Christopher v. Covington, 2 B. M., 358; German Insurance Bank v. Nunes, 80 Ky., 334; Baldwin v. Peet, 22 Tex., 520; Exchange Bank v. Stone, 80 Ky., 109; Bowles-Bridgeford-Barbour Cases, 80 Ky., 529; Drake v. Ellman, 80 Ky., 439; Dietz v Sutcliffe, 80 Ky., 650; Nicholson v. Leavitt, 6 N. Y., 517; State, &c., v. Benoist, 37 Mo., 516; Eyre v. Beebe, 28 How. Pr., 333; Stickney v. Crane, 35 Vt., 89; Bentz v. Rockey, 69 Pa. St., 77; Smith v. Conkwright, 28 Minn., 26; Nesbitt v. Digby, 13 Ill., 393; McIntire v. Benson, 20 Ill., 503; Phelps v. Corts, 80 Ill., 113; Gardner v. Com. Nat. Bank, 95 Ill., 307; Matthews v. Poultney, 33 Barb., 127; Bennett v. Ellison, 23 Minn., 242; Gere v. Murray, 6 Minn., 305; Lesher v.

Getman, 28 Minn., 93; Keevil v. Donaldson, 20 Kans., 167; Work v. Ellis, 50 Barb., 513; Kiteltas v. Wilson, 36 Barb., 302; Cuyler v. McCartney, 40 N. Y., 237.)

The assignment in this case was intended by the debtors as a means of effecting a compromise, and also to suppress or prevent criminal prosecutions for felonies connected with their transactions with their creditors. These two companion purposes and intents are sufficient to invalidate the deed.

2. Under the Kentucky statute an assignee for the benefit of creditors does not acquire title to the assigned property as against an attaching creditor, until he takes the oath and executes the bond required in the manner prescribed by law. (Bartlett v. Teah, 1 Fed. Rep., 768; Clayton v. Johnson, 36 Ark., 406; Rice v. Frayser, 24 Fed. Rep., 460; Thatcher v. Franklin, 37 Ark., 64; Falconer v. Hunt, 39 Ark., 68; Juliand v. Rathbone, 39 N. Y., 360; Kingman v. Barton, 24 Minn., 295; Hardman v. Brown, 39 N. Y., 196; Mathers v. McMillin, 60 Wis., 546.)

3. The bond required of the assignee must be executed in *open* court, and until the requisite bond has been executed the assignee has no right of possession, and can neither sue for, nor defend actions concerning, the assigned property. (Clayton v. Johnson, 36 Ark., 407; Thatcher .v. Franklin, 37 Ark., 64: Falconer v. Hunt, 39 Ark., 68; Rice v. Frayser, 24 Fed. Rep., 460; Aaronson v. Deutsch, 24 Fed. Rep., 465.)

The term "open court" has a specific meaning. It is essential to the validity of the proceedings of a court, or in fact to constitute a court, that the judge of the court must himself be present, and orders must be entered at the time and place and in the manner prescribed by law. (State v. Jefferson, 56 N. C., 309; Wight v. Walbaum, 39 Ill., 554; Wicks v. Ludwig, 9 Cal., 175; Doe v. Waggoner, 3 Texas, 515; Bond v. Pacheco, 30 Cal., 530; People v. Dohning, 59 N. Y., 374; Glasgow v. Casaneuva, 30 Cal., 560; Norwood v. Kenfield, 34 Cal., 329.)

The county court in Kentucky being a court of limited and special jurisdiction, its proceedings may be questioned in a collateral proceeding. (Jacobs v. L. & N. R. R. Co., 10 Bush, 263; Johnson v. Commonwealth, 80 Ky., 377; Commonwealth v. Pullam, 3 Bush, 47.)

But if not, the order called in question in this case does not show on its face that it was entered in *open* court; and if the facts necessary to confer jurisdiction do not appear, the judgment will be treated as void. (Freeman on Judgments, sec. 123; Stevens v. Wilson, Harr. & J., 130; Foster v. Glazneer, 27 Ala., 391.)

4. Appellant was entitled to personal judgment against Payne & Viley, and to have his attachment sustained, independent of the validity of the deed of assignment.

Bank of Commerce v. Payne, Viley & Co., &c.

5. Even conceding the validity of the assignment, chattels which were exempt at the date of the deed of assignment, and which were excepted from its provisions, were subject to appellant's attachment, as they had ceased to be exempt at the date of the attachment.

6. Where creditors, without a knowledge of all the facts, assent to an assignment, they are not thereby precluded from attacking it as fraudulent. (Hairgrove v. Millington, 8 Kans., 480; Burrill on Assignments, 4th ed., pp. 426, 427.)

7. The power to sell on credit is always a badge of fraud. (Wait on Fraudulent Conveyances, p. 416; Christopher v. Covington, 2 B. M., 368; Billings v. Billings, 2 Cal., 113; Bump on Fraudulent Conveyances, 418; Richardson v. Marqueze, 59 Miss., 96; Hardy v. Skinner, 9 Ind., 191; Carlton v. Baldwin, 22 Tex., 724; Johnson v. McAllister, 30 Mo., 327; Shackelford v. Bank, 22 Ala., 238; Nicholson v. Leavitt, 6 N. Y., 510; Bowen v. Parkhurst, 24 Ill., 257; Norton v. Kearney, 10 Wis., 443; Truitt v. Caldwell, 3 Minn., 364; Mussey v. Noyes, 26 Vt., 462; McCleery v. Allen, 7 Neb., 21; McCallie v. Walton, 37 Ga., 611; Beuss v. Shaughnessy, 2 Utah, 492; Richardson v. Rogers, 45 Mich., 591.)

8. Where there is a provision in the assignment that such creditors as sue and attack the deed shall be debarred from the benefit of the assignment or postponed until all of the other creditors are paid, such a clause makes the deed fraudulent on its face. (Burrill on Assignments (3d edition), sec. 385; Bump on Fraudulent Conveyances, p. 427; Grinnell v. Adams, 11 Humph., 283; Marsh v. Bennett, 5 McLean, 117; Murray v. Riggs, 15 Johns., 571; McFarland v. Birdsall, 14 Ind., 126.) And whatever would avoid the assignment, if apparent on the face of the deed, will have the same legal effect if made to appear by extraneous evidence.

A formal notice served by the assignee on appellant, that unless, without delay, it dismissed this suit, the assignee would resist its debt and shut it out from any participation in the trust estate, shows the sympathy and co-operation of the assignee with the debtors.

B. F. BUCKNER for FIDELITY TRUST and SAFETY VAULT CO., APPELLEE.

1. To the argument that the deed of trust is invalid, because of the issual of the attachment before the execution of a bond, the answer is three-fold:

(a.) The charter of the Trust Company wholly dispenses with this formality in cases in which it is the trustee.

(b.) The act of 1860 prescribes no time for the execution of the bond, and the bond, when executed, took effect by relation as of the time of the execution of the deed.

(c.) The act of 1860, even if applicable to the Trust Company, does

not invalidate the assignment if bond is not executed, but is merely directory. (Juliand v. Rathbone, 39 Barb., 99; Juliand v. Rathbone, 39 N. Y., 375; Brennan v. Willson, 71 N. Y., 505; Clayton v. Johnson, 36 Ark., 434; 1 Fed. Rep., 716; Hardcastle v. Fisher, 24 Mo., 74; Dullam v. Fitler, 6 W. & S., 326; Whitworth v. Patterson, 6 Lea., 119; Black v. Weathers, 26 Ia., 243.)

Whenever a statute provides that an officer shall, within a specified time, perform a given duty, a performance after the time has elapsed is valid, unless the act expressly prohibits such subsequent perform‑ ance. (Sedgwick on Construction, 315, etc.)

2. The power to sell on credit does not render ·the deed fraudulent. (Rogers v. De Forrest, 7 Paige Ch'y, 272; Nicholson v. Leavett, 4 Sand., 297; James v. Whitbread, 5 Eng. Law & Eq., 432; Ashurst v. Martin, 9 Porter, 576; Abercrombie v. Bradford, 16 Ala., 565; Farquharson v. Echelberger, 15 Md., 63; Meuriel v. Murdock, 13 Md, 164; Berry v. Matthews, Ib., 537; Conklin v. Coonrod, 6 Ohio St., 620.)

3. The mere hope that an amicable adjustment would subsequently be‑ made, or even that the execution of the general assignment would 'induce the creditors to more favorable terms and action, are not at all evidence of an intent to hinder and delay creditors.

The case of Bennett v. Ellison, 23 Minn., 242, properly understood, has no application to a case like this. But if so, it has been vir‑ tually overruled by the later case of Lesher v. Getman, 28 Minn., 94.

4. The conduct of appellant's president in attending the creditors' meet‑ ing and voting for the resolution adopted unanimously by that meet‑ ing was a formal assent to the terms of the assignment. (Vernon v. Morton, 8 Dana, 267; Burrill, 418, 421; Merrill v. Englesby, 28 Vt., 157; White v. Bank, 21 Ala., 75; Geisse v. Beall, 3 Wis., 307.)

The acceptance of the terms of an assignment by a creditor extin‑ guishes his right to treat it as void. (Chaffee v. Fourth National Bank, 71 Me., 514.)

5. Payne is still entitled to the exemptions to which he was entitled at the date of the deed of assignment. His flight to Canada, being tempo‑ rary, did not change either his domicile or his status as house-keeper, his family remaining domiciled in Louisville. (Dicey's Law of Domi‑ cile, 66-8, 74-81, 86-8; Seaton v. Marshall, 6 Bush, 430; Anthony v Wade, 1 Bush, 112; Carrington v. Herrin, 4 Bush, 626.)

SAME COUNSEL IN PETITION FOR REHEARING.

1. There was no fraudulent, covinous or malicious *intent* on the part of Payne & Viley, at the time of the execution of the deed; but if there was any illegal purpose on their part, it was a mere collateral *motive* not carried into or becoming a part of the deed.

There is an important distinction between the *motive* which actuates

the debtor to make the deed and the *intent* which he desires to carry into execution by it. The *intent* becoming a part of the deed, and executed by its terms or intended to be executed by it, will render it void if forbidden by the statute, whereas the motive which actuated its execution is wholly collateral and utterly immaterial, if the *intent* put into execution by the deed be lawful or not forbidden by the statute. (Burrill on Assignments, secs. 325, 327; Meux v. Howell, 4 East., 1; Wilder v. Winne, 6 Cow., 284; 1 Ired. Law, 490; 2 Mich., 390; Hoffman v. Mackall, 5 Ohio St., 124; Reed v. McIntyre, 98 U. S., 507; Bank U. S. v. Huth, 4 B. M.; Bump on Fraudulent Conveyances, 3d edition, 357, and cases in note 1, 358; *Ibid.*, 271; Vanwyck v. Seward, 18 Wend., 375; Brooks v. Markery, 11 Wheat., 83; Stewart *et al.* v. Spencer, 1 Curt., 165; Horwitz v. Ellinger, 31 Md., 504; Pike v. Bacon, 21 Me., 285; Wilson v. Berg., 88 Pa. St., 167; Freeman v. Pope, L. R., 5 Ch'y App., 538; Bump, 353, 354; Reinhard v. Bank of Ky., 6 B. M., 252.)

2. A deed of assignment for the benefit of creditors is sustained by a valuable consideration (Burrill on Assignments, section 236), and in order to render the assignment invalid, the grantee must be a participant in the fraudulent intent of the grantor. (Emerson v. Senter, 118 U. S., 3; Abercrombie v. Bradford, 16 Ala., 564; Cornish v Dews, 18 Ark., 172; Myers v. Kenzie, 26 Ill., 36; Staus v. Rose, 59 Md., 525; Hollister v. Lord, 2 Mich., 310; *In re* Mann, 32 Minn., 60; Gates v. Lebeaunere, 19 Mo., 17; Bancroft v. Blizzard, 13 Ohio, 30; Spencer v. Jackson, 2 R. I., 35; Bump, 381, note 3.)

JOHN MASON BROWN AND GEO. M. DAVIE OF COUNSEL ON SAME SIDE.

JUDGE LEWIS DELIVERED THE OPINION OF THE COURT, CHIEF JUSTICE PRYOR DISSENTING.

September 10, 1884, the Bank of Commerce instituted this action against Payne & Viley, a firm composed of H. C. Payne and John T. Viley, doing business prior to that time in the city of Louisville.

In the petition it is stated the plaintiff held four promissory notes, not then due, on the firm for the aggregate amount of eighteen thousand five hundred dollars; that each of the defendants had departed from the county of his residence to avoid the service of summons, and had sold, conveyed or otherwise disposed of

his or their property, or suffered or permitted it to be sold with the fraudulent intent to cheat, hinder or delay his creditors. In an amended petition it is stated the deed hereafter referred to was made by them with like intent.

An attachment was issued, and The Fidelity Trust and Safety Vault Company, created a corporation by the General Assembly, was, with others, summoned on the same day as a garnishee.

September 12 the plaintiff filed in the clerk's office its amended petition, making said corporation a party defendant, and stating therein that September 6 Payne & Viley executed and acknowledged a pretended deed of trust purporting to transfer to it all the property owned by them as partners and as individuals, except such as was by law exempt from execution, the kind and description of which is set out in the amended petition.

It is recited in the deed, a copy thereof being filed as an exhibit, that the conveyance was made to the corporation in trust to collect all the property mentioned therein, and with convenient speed sell the same for cash, or on such reasonable credit as the trustee in its discretion might deem for the best interest of the creditors of Payne & Viley ; and that the trustee should, of the money collected, first pay all charges, costs and reasonable compensation to itself, and the balance left to all creditors of the firm and of the individual members thereof, according to such priorities or liens as existed by law or contract, and then to distribute ratably.

It is also stated in the amended petition that said

corporation September 8, took possession of a consid-erable portion of the property, and sold some of it before this action was commenced, but did not by any one of its officers qualify as trustee until after the writ of attachment was issued and executed upon divers garnishees, nor had executed the bond required by law in such cases when the amended petition was filed.

The relief prayed for was judgment setting aside the deed, subjecting the property conveyed thereby and that attached to the satisfaction of the debts, and in a subsequent pleading, the notes having become due in the meantime, personal judgment against Payne & Viley thereon was also asked.

Payne & Viley, though not actually summoned, en-tered by counsel their appearance, and filed answer, denying the deed was executed with the intent alleged by the plaintiff, and controverting the grounds of the attachment, as was likewise done by the trustee in its answer; but the justice of the debts sued on was not controverted by either of the defendants.

The judgment appealed from is, that the attachment be discharged and petition dismissed at the plaintiff's costs.

There is very little room for discussion about the facts of this case, but legal questions arise, some of which have not heretofore been passed on by this court.

It appears that Payne & Viley commenced business as warehouse and commission merchants in 1878, and were from the beginning in the habit of giving ware-house receipts on bagging in, or by them represented to be in, their warehouse, as collateral security for the payment of money borrowed from banks.  One of the

members also contracted individual debts, for which he pledged his private property, consisting principally of stocks and bonds, and in the end became heavily involved.

In the summer of 1882, as both members of the firm in their depositions admit, they knew it was insolvent, but except their book-keeper no one else was aware of, or seemed to suspect it, and, consequently, they were enabled to effect new loans, or postpone the payment of existing debts by means of the warehouse receipts, although, as the book-keeper testifies, "they disposed of the bagging while the receipts were still outstanding without the consent of the holders of such receipts."

In July, 1884, however, being convinced they could not much longer conceal the actual financial condition of the firm, they commenced to devise some plan by which to obtain a composition settlement satisfactory to its creditors, and consulted a friend on the subject, and soon after employed counsel to advise and aid them.

There was at first a difference of opinion as to the feasibility of obtaining such settlement without the execution of a deed of assignment, which, for manifest reasons, they wished to avoid, one of the members of the firm and the friend consulted believing it could be done, while the other and their counsel believed it could not.

But it was understood and agreed between them, that in order to have the required time in which to determine upon and carry out the plan most likely to accomplish the object of settling with and satisfying the creditors, it was essential to obtain a renewal of such

of their notes as fell due about that date. And to induce the banks, their creditors, to agree to it, the members of the firm, or one of them, represented that as the season for the sale of bagging did not commence until about September, it was necessary for payment of the debts to be deferred until that time to enable the firm to sell the bagging for which the receipts held by the banks had been given, and with the proceeds of such sales as made to take up the receipts.

Accepting that representation as true, and believing the bagging was still in possession of the firm, the officers of the banks applied to, except one, the Breckinridge Bank, consented to the proposed renewal and extension, while the debt of the one that refused was then paid off in full.

Immediately after that transaction Payne, who seems to have been the leading and controlling member of the firm, left his place of business and county of his residence, and remained away until Saturday September 6, when, being notified by his friend, he returned to Louisville for the purpose of executing and acknowledging the deed of assignment, which was done in the office of their counsel after 9 P. M., the President of the Fidelity Trust and Safety Vault Company being there ready to accept, and a deputy clerk present to take acknowledgment of the deed, both of whom were admonished to say nothing about the transaction.

In each of the two daily newspapers published in Louisville the next morning, Sunday, an article appeared, prepared at the instance of Payne & Viley, in which the assignment was announced, and the statement made the debts were less than half the amount

they turned out to be, and the assets sufficient to pay them. And on the same day, by the first outgoing railroad train, they both left and went to another county of the State, for the purpose, as they substantially admit, to avoid inquiries as to the actual condition of the firm, and to await the action of their creditors on the proposition for a settlement to be submitted at a meeting which was held the next day, Monday.

The estimated value of the firm and individual assets, as appears from a memorandum furnished by them to their creditors, was about ninety-three thousand dollars; but two items of the list, valued at twenty-five thousand dollars, could not then be regarded as more than possibly available in paying the debts, even if in good faith so designed, because they consisted of proceeds of land lying in a distant State, the property of Payne's wife, the power to sell which for that purpose was questionable, and a gift from his father, which might or might not be made.

On the other hand, the indebtedness of the firm was about one hundred and sixty-one thousand dollars, and that of Payne about fifty-nine thousand dollars, while, of about forty-two thousand rolls of bagging, for which they had issued and delivered to their creditors warehouse receipts as collateral security, about thirty-seven thousand, valued at about one hundred and forty-four thousand dollars, had been disposed of, only about five thousand five hundred rolls being, upon examination made after the execution of the deed, found in their warehouse or under their control.

Being, as they state in their depositions, advised by

their counsel that their creditors had rejected their proposition for a settlement, were very angry with them, and that it was the only thing left for them to do, both. Payne & Viley immediately after the creditors' meeting left the United States and went to the Dominion of Canada, where they remained up to the time the judgment was rendered.

Whether the deed of assignment be valid or not, we think the lower court was not authorized by the pleadings and proof in this case to either dismiss the petition or discharge the attachment.

The record shows Payne & Viley, by their employed counsel, went into court and filed an answer, which was not only duly sworn to by them, but, as they admit, expressly authorized by them to be filed. They should, therefore, be regarded as waiving actual service of summons and before the court; and such being the case, the plaintiff was clearly entitled to personal judgment against them for the debt sued on. The proof is sufficient to sustain both the alleged grounds of attachment.

The purpose of Payne in absenting himself from the county of his residence from July to September, as is substantially admitted by him, was to prevent inquiry and investigation by creditors in regard to the true condition of the firm, and the fraudulent methods of business used by the members, which he knew would inevitably cause meritorious actions to be brought and summons issued against them.

Their flight to Canada, though for the purpose of avoiding arrest to answer a criminal charge, had the effect to prevent the service of summons to answer in

a civil action for the same wrong. While, therefore, the proof does not bring this case within the letter, it does come within the reason of subsection 4, section 194, Civil Code.

The second ground existed beyond question. For if the disposal by the debtor for his own benefit, without consent of the creditor, of goods for which warehouse receipts have been issued and delivered as collateral security for money borrowed be not an act done with the fraudulent intent to cheat, hinder and delay such creditor in the meaning of subsection 7, it is hard to conceive a case that would be. Such an act is not only fraudulent, but by statute is made criminal.

The bagging for which warehouse receipts were held by the Bank of Commerce was, as its chief officer testifies, of value sufficient to satisfy the whole of its debts against the firm; but it had been fraudulently disposed of, and none was to be found when this action was commenced.

The remaining inquiry in this connection is, then, whether there was any property besides that attempted to be conveyed by the deed of assignment subject to the plaintiff's debts.

The trustee did not acquire by the deed any interest in or control of the property of H. C. Payne that was then exempt from execution by reason of his status of *bona fide* housekeeper with a family, then, as it is conceded, existing, for it was expressly excepted from the conveyance. Nor has Payne, though a party, set up any claim to that property, or to the proceeds of such of it as has been sold.

Therefore, though we think the evidence shows he

had, before the judgment was rendered, ceased to be such housekeeper, it is immaterial whether he had or not. For whatever right he had to the property or its proceeds was waived by his failure to set up claim to it in this action, and it was in the power of the court and its duty, having control of the fund arising from that source, to have applied it to the debts of the plaintiff, the only other party having any claim to it.

The two grounds upon which it is contended the deed of assignment is invalid and inoperative against the attachment are :

1. That the trustee failed to comply with section 1, chapter 109, General Statutes.

2. That it was made with intent to delay, hinder or defraud creditors.

The section referred to is as follows :

"That hereafter it shall not be lawful for the trustee or assignee, in any conveyance made for the benefit of creditors, in anywise to proceed to execute the trust until he shall appear in the county court of the county where such conveyance may have been recorded, and take an oath faithfully to execute the duties confided to him by such conveyance agreeably to law ; and shall likewise execute a covenant in open court with good and sufficient security, to be approved by said court, payable to the grantor, or any beneficiary in such conveyance, to the effect that he will faithfully, in proper time, discharge all the duties of trustee or assignee imposed upon him by the conveyance, or by the laws of the land."

It appears that the attachment was issued and levied, and summons executed on the Fidelity Trust and

Safety Vault Company, before either the required oath. was taken or bond executed, and that it was not until February, 1875, that any bond with personal security was made, the first one having been given without. It is, however, contended for appellees that by section 9 of the act incorporating the company, and empowering it to act as an assignee, it was exempted from the duty of giving personal security in such cases. That section is as follows: "The capital of said company shall be taken and considered as the only security required by law for the faithful performance of its duties; and other security shall not be required upon its appointment to any of the offices or duties mentioned herein, except when required by the courts or by parties in interest."

We perceive no necessary conflict between the two sections; for the court may, in its discretion, require the company, at the time the bond is executed, to give personal security, or may dispense with it, and in either case the instrument would be good as a statutory bond.

But we do not assent to the proposition of counsel that the assignee did not, under the statute, acquire title to the property, and as a consequence the attachment lien of the plaintiff should prevail, merely because process in this action was executed before the oath was taken or bond was executed.

To sustain [that position we have to disregard a rule, admitting of no exception, that a trust never fails for want of a trustee, and to assume the Legislature intended by the section quoted that the beneficiary interest already vested in creditors, so far as a deed of

assignment, duly executed, acknowledged and accepted, can vest such an interest in property, may be divested by any appreciable delay to take the oath and give the bond, by the mere recipient of the nominal legal interest.

Before the enactment of the section quoted it was settled by this court, that if a deed of assignment be valid, it cannot be rendered invalid by omission or negligence of the assignee. (Bank U. S. v. Huth, 4 B. M., 423.) And counsel admit that, prior to that section, the deed, if valid, operated to pass the title of the property to the assignee, and, as a necessary consequence, it was not subject to attachment.

It seems to us that admission is fatal to their argument. For both the reason for the statute and the language used show it was intended to benefit, not prejudice, the beneficiaries, to render more certain and secure, not more uncertain and precarious, their rights and interests. It was manifestly for the better security of creditors against the fraudulent and improvident conduct of assignees that the oath and bond are required, and for no other apparent reason; for the faithful execution of his duties by the assignee enures to their benefit, and to them and the grantor, who is entitled to the residuum, is the bond made payable.

We think if it had been intended that the omission or delay of the assignee should so unjustly prejudice the rights of the beneficiaries, not at all in fault, language not susceptible of misconstruction would have been used to say so.

The principal ground upon which the deed is assailed is, that it was in the language of section 1, article 1,

chapter 44, General Statutes, made "with the intent to delay, hinder or defraud creditors."

But we will first consider the effect to be given to the attendance at a creditors' meeting held September 8, and the assent by the chief officer of the plaintiff to a resolution then adopted, in substance authorizing and requesting the assignee to proceed to collect and apply the property conveyed to pay the debts.

In the reply of the plaintiff it is stated, and not controverted, that at the time of that meeting its president was not informed of the nature and contents of the deed, and he testifies to the same fact.

The circumstances of this case preclude the belief that officer acted fraudulently or in bad faith to either the grantors, assignee or the other creditors. And in view of the short time that had elapsed since the execution of the deed, and the conduct of the grantors, of which the creditors were not then fully advised, we think it would be an improper and unreasonable application of the doctrine of estoppel to deprive the plaintiff of the right to have it set aside, if, as alleged, it was fraudulently made.

The ruling of this court as to the true test of the validity of deeds of assignment, which are in terms embraced by the statute, has been uniform and unvarying, for the language used admits of but one interpretation.

" It is the intent and purpose with which the grantor acts that characterizes the conveyance and renders it fraudulent under the statute." (Taylor v. Eubank, 3 Mar., 239 ; Lyne v. Bank of Ky., 5 J. J. M., 545 ; Lowry v. Fisher. 2 Bush, 76.)

"We readily concede that if the intention in the execution of the deed be to hinder or delay creditors, such an intention entering into and producing its execution, being against the statute and bad, will vitiate the whole deed though it be made upon a good consideration, or for the just and equitable purpose of securing an equal distribution of the effects among all the creditors. * * Where it appears on the face of the deed of trust that the motive for making it was to *prevent a sacrifice* of the property a bad motive is shown—a motive to obstruct the ordinary process of law in the subjection of the property, to the payment of the debts, which vitiates the whole deed. So, if that motive and intention be proved *aliunde.* (Vernon v. Morton, 8 Dana, 263.)

"In every such assignment some delay is unavoidable. It is not, therefore, the fact of delay but its character, and the motive which actuated it, that is deemed fraudulent in law." (Christopher v. Covington, 2 B. M., 358.)

"The object of the statute was to prevent deeds, etc., fraudulent in their *inception* and *intention,* and not merely such as in their *effect* might hinder or delay other creditors. It is the corrupt and covinous *motive,* the fraudulent *intention,* the *mala mens* with which the assignment or conveyance is made, that constitutes the fraud against which the denunciations of the statute are directed ; and without the existence in fact, or presumed existence, of an immoral or bad *intention* or *motive,* fraud cannot be perpetrated, either at common law or under the statute. The *motive* or intention is to be arrived at from the facts and circumstances ap-

pearing in each particular case." (Bank U. S. v. Huth, 4 B. M., 430.)

In German Insurance Bank v. Nunes, 80 Ky., 334, is this language : " In all cases where conveyances are made for the ostensible purpose of securing an equal distribution among creditors of the property of the debtor, the validity of the conveyance depends upon the intention of the debtor. If the intention is to hinder and delay creditors in the enforcement of their demands against the debtor, rather than to secure an equitable distribution of the property among creditors and for their benefit, the conveyance is fraudulent and void. It is not the effect of such conveyances that determines their validity, for every such conveyance in effect hinders and delays creditors. It is the intention that controls, and that intention cannot be better determined than from the language of the conveyance, although it may be established by extrinsic evidence."

In Codogan v. Kennett, 2 Cowp., 432, Lord Mansfield, construing the English statute 13 Elizabeth, said : " The question in every case is whether the act done is a *bona fide* transaction, or whether it is a trick or contrivance to defeat creditors."

And as said in Burrill on Assignments, section 332, " the same test has been referred to as decisive by Story in his work on Equity Jurisprudence, and by Chief Justice Marshall in U. S. v. Hare, 3 Cranch, 73.

The preamble to the English statute, from which our own against fraudulent conveyances was taken, so clearly and fully sets forth the reason and object of such enactment as to leave no room for doubt or construction. It is as follows : " For the avoiding and

abolishing of feigned, covinous and fraudulent feoff-ments, gifts, grants, alienations, conveyances, etc., more commonly used and practiced in these days than hath been seen or heard of heretofore, which feoffments, etc., have been and are devised and contrived of mal-ice, fraud, covin, collusion or guile, to the end, purpose and *intent to delay, hinder and defraud creditors* and others of their just and lawful actions, suits, debts, accounts, damages, penalties, forfeitures, etc., not only to the let and hinderance of the due course and execution of law and justice, but also to the over-throw of all true and plain dealing, bargaining and chevisance between man and man, without the which no Commonwealth or civil society can be maintained or continued."

It seems to us impossible, looking at either the lan-guage or reason of the statute, to adopt any other test of 'the validity of a deed of assignment. For having the necessary effect of suspending and in many cases defeating altogether "remedy by the due course of law," guaranteed by the Constitution, it should never, when attacked by a complaining creditor, be upheld, if made in bad faith and tainted with fraud. Accord-ingly, as held in Vernon v. Morton, though such deed be made upon a good consideration, or for the just and equitable purpose of securing an equal distribution of the effects among all his creditors, yet, if the intention in the execution of it be to delay, hinder or defraud them, such an intention entering into and producing it will vitiate the whole deed. And as said in Christo-pher v. Covington, in every such assignment some delay is unavoidable; but it is not the fact of delay

or hinderance, but the intent or purpose which actuates. the assignment that stamps it as *bona fide* or fraudulent.

As, then, it is not the actual tendency or effect of such a deed, but the intent with which it is made, that determines the question of its validity, it follows that if it be a trick or contrivance for the debtor's own advantage, an equal and honest distribution of his estate among his creditors being a secondary and subordinate consideration, or part of a plan or scheme previously concocted, in pursuance of which creditors are intended to be, or have been deceived into false security, overreached and defrauded, then the transaction should be held tainted and the deed vitiated and void.

It does not appear that the assignee, or the beneficiaries under the deed, participated in the fraud imputed to the grantors, nor is it necessary they should have done so in order to render it invalid. For, as recently held by this court, an assignee for the benefit of creditors generally is not a purchaser for value. He stands in the position of his assignor, and can assert no equity that could not be asserted by the debtor himself. (Bridgeford, Trustee, v. Barbour, &c., 80 Ky., 529; Dietz's Assignee v. Sutcliffe, 80 Ky., 650.) Nor does it affect the question that in setting aside the deed the attaching creditor may, to the partial exclusion of others, be paid his entire debt. For it is not the right of a debtor, unless in good faith and legally done, to deprive any creditor of the remedies given by law, and the injury to those who choose to abide by a fraudulent deed is of less consequence than the necessity of enforcing "true and plain dealing between man and man."

In testing the deed of assignment in question by the rules mentioned, so plainly in accord with the letter, object and scope of the statute, the first inquiry that naturally arises is why, if the intent of Payne & Viley was to make an honest, fair and full transfer of their estate for the benefit of creditors, it was not done in July? The hopeless bankruptcy of the firm was then known to them; its business was at an end and practically abandoned.

This record places it beyond question that their leading and controlling purpose was to bring about a composition settlement with creditors, whereby to obtain a release from their debts, and get possession of and destroy the outstanding warehouse receipts, which were indisputable evidence of their criminal violation of law. It is equally clear that the assignment was a secondary consideration, and not made until they were advised and became satisfied the main object could not be accomplished without it.

They, therefore, in order, using the language of Payne, "to hold the thing in its present shape until ripe for settlement," not only delayed until September what good faith to their creditors required done in July, but intentionally and studiously kept the true condition of the firm in the meantime concealed from them. But as most of the debts were falling due, and suits would be commenced for their collection, unless an arrangement deferring payment could be made, they got all of them renewed but that due to the Breckinridge Bank, by falsely representing they still had the bagging for which the receipts were given. The Breckinridge Bank is not shown to have had any

greater claim upon them than the others, and the only reason for discriminating in its favor by paying its debt in full, when they knew their estate was not sufficient to pay one-half of the whole indebtedness, was that it was necessary to prevent suit by it, and the consequent exposure of the condition of the firm, which it was their purpose to then conceal.

The same motive induced Payne to leave Louisville after the debts were renewed, for he admits he left to avoid inquiry and investigation by the creditors.

The time and circumstances under which the deed was executed, and the false statement made the next day in newspapers, show the same leading and consistent purpose to deceive creditors as to the actual condition of the firm and their methods of business, and thus more certainly bring about the settlement and enable them to secure possession of the warehouse receipts.

The evidence makes it plain to us that the deed was executed, not in good faith and with intent to deal fairly and justly by creditors, but in furtherance and as part of a scheme devised by the debtors to obtain an advantageous settlement, and to prevent the enforcement of the statute violated by them, in the accomplishment of which they had already deceived, defrauded and wronged their creditors.

To adjudge such deed valid merely because under it there may be an equal distribution of such of their estate as the debtors may have seen proper to give up, would be neither wise policy nor sound morals.

The judgment of the lower court is reversed for further proceedings consistent with this opinion.

Chief Justice Pryor delivered the following dissenting opinion :

The intent of the grantor in making a conveyance or the assignor in making an assignment, is the important inquiry in determining the validity of the instrument when assailed for fraud ; and if the motive for making the conveyance and the purpose to be effected by it is illegal if carried out, the conveyance will be canceled.

That this is the undoubted rule to be applied between the debtor and grantor on the one side and his creditors on the other, will not be denied.   In fact, there is no essential difference between my associates and myself as to this general doctrine ; but when applied to the facts of the particular case, I feel compelled to dissent from the opinion rendered.   This conveyance is assailed by the appellant, one of the creditors of Payne & Viley, on the ground that it was made to delay, hinder or defraud their creditors, and, therefore, under the statute against fraudulent conveyances, is void.   The assignment was adjudged valid by the court below, and that judgment has been reversed.

I maintain, first, that no creditor has been defrauded by the execution of the conveyance, or hindered and delayed in the collection of their debts ; second, that if the debtors were insolvent when they made the assignment, and by its terms disposed of all their property for creditors without preference, and reserving no advantage to themselves to the prejudice of creditors, the chancellor will not look to the motive influencing the debtors in its execution—that, although the prime object in making the assignment was the hope, expectation or belief on the part of the debtors that the cred-

itors would release them from the balance of their
debts, or would decline to prosecute them for crimes
committed originating out of their business transac-
tions, such purposes or intention can not affect the
validity of the instrument, unless an agreement to com
pound the felony has been shown, or by the terms of
the assignment the title was to vest in the assignee for
creditors on such a condition. I shall assume, there-
fore, that Payne & Viley commenced a system of fraud
by repeated promises to pay, and the renewal of paper
to the banks so as to give them ample time to prepare
for an assignment that would result, in their opinion,
in the delivery to them of their warehouse receipts by
their creditors, and in that manner escape all criminal
responsibility.

The concession made is broader, perhaps, than the
facts justify, but necessary to meet the legal questions,
or rather the view taken of this case by my associates.

If the purpose to be effected by the assignment is
illegal, that is, if the illegal consideration becomes a
part of it, either expressly or by fair construction, or
is to be carried out by the parties interested, whether
by secret agreement or otherwise, then the assignment
is void.

When absolute and unconditional, and the assign-
ment is made not only to secure honest debts but all
the *bona fide* debts of the grantor, then the motive to
constitute the fraud must in some manner enter into the
transaction itself in order to affect innocent parties or
honest creditors.

The reason is, that it is not unlawful for a dishonest
man, one whose life has been mainly devoted to de-

frauding others, to make an assignment for the benefit
of all his creditors; and although the prime purpose
is the belief on the part of the debtor, at the time he
executes it, that his creditors will then be merciful to
him and relieve him from punishment for crime, it is not
such a motive as should cause the chancellor to cancel
a conveyance equitable in all of its terms and just in
its results.

When the intent is unlawful and enters into the
agreement, it is not doubted that the conveyance is
void; the sufficiency of the consideration in such a
case will not uphold the conveyance, and as was said
in Vernon v. Morton, 8 Dana, 247, "if the object be to
delay and hinder creditors, the just and equitable dis-
tribution of the effects among all creditors" will not
save the conveyance. Men do many lawful acts from
impure or improper motives; but the vicious purpose
will not of itself render that unlawful that without it
would be lawful. It was the duty of the debtors in
this case, both in law and morals, to secure equality
among their creditors. The claims upon them by those
they had defrauded, as well as all other creditors,
demanded of the debtors in their insolvent condition
that an assignment should be made. They could make
no preference, and when providing for creditors they
were compelled to secure equality to all. The act of
an insolvent debtor in producing equality between
creditors in the distribution of his assets is both com-
mendable and lawful, and when done, it is immaterial
what motive prompted the debtor in its execution.
The motive may be corrupt, but when no creditor has
been injured by it, and no advantage obtained by the

debtor under it, either by an agreement with creditors
or others, the act is lawful, and the transaction should
not be disturbed. The creditor who has been provided
for with all others under the same instrument will not
be listened to because his vigilance has enabled him
to discover an impure motive on the part of the debtor
in its execution. The assignment had been accepted
by the assignee, and also by nearly all the creditors,
including the President of the appellant, before the
latter obtained its attachment; but it is alleged, and
doubtless true, that when the assignment was accepted,
or the resolution passed directing the assignee to sell
and pay creditors as soon as practicable, and for which
the President of the appellant voted, the latter was
not aware of the contents of the assignment, or the
motives causing the execution of the instrument.
While one can not be estopped by reason of the
existence of facts he could not have ascertained—and
I do not propose to rest the determination of this case
on the doctrine of estoppel—it shows the danger in
permitting mere intent and motive to invalidate an
instrument lawful in itself, protecting the rights of all
and injuring no one. What facts were discovered and
really existed? It was ascertained that Payne & Viley
had, in dealing with the appellant (a bank), and many
other banks, subjected themselves to a prosecution for
felony by reason of certain warehouse receipts they had
deposited as collaterals. That they were or had been
maturing a plan to compromise with creditors and get
possession of those receipts that evidenced their crime.
That in order to do this they obtained renewals of their
paper from time to time, until a period had been

reached when they could make an assignment, and bring, as they believed, the creditors to the desired compromise.

They then made the assignment with all their motives unknown to any creditor, and it is now held that the discovery of the fraudulent purpose must cancel the deed and give the assets to the attaching creditor to the exclusion of all others. The intent, purpose and belief formed no part of the contract, but was the inducement to do an act which every principle of equity and justice demanded should be done. That which was lawful is set aside, and that which seems to me to be inequitable and unjust directed to be substituted by the chancellor.

It is proper to examine the cases in which the general doctrine as to *intent* on the part of the grantor has been applied, and the utterances made in the opinions delivered, now relied on as establishing the principle to be followed by the chancellor in the present case. The facts and circumstances connected with those cases may be and are essentially different from the one under consideration, and, therefore, the propriety of making the investigation to see how this doctrine has been applied, so as to enable us to distinguish the one class of cases from the other. It will be found that those utterances were made either in cases where there was no fraud established, as in Vernon v. Morton, 8 Dana, 247, and Bank of U. S. v. Huth, 4 B. M., 423, or in cases where the fraudulent motive or intent affected the rights of creditors, or resulted in some advantage to the debtor or the grantor. In the case of Ward v. Trotter, 3 Mon., 1, the consideration was sufficient, but

the fraudulent intent appearing on the face of the deed,
it was held as a matter of law that the deed was void.
The facts being conceded, the legal question was alone
raised.

The recital in the deed in that case was, that the
debtor *had ample property* to pay his debts, but
made the conveyance to prevent a sacrifice of his
property. •In the late case of the German Insurance
Bank v. Nunes, 80 Ky., 334, the debtor made an assign-
ment of like character, the deed expressing on its face
that he had ample estate to pay his debts, but to pre-
vent a sacrifice of his property he conveyed it to an
assignee for his creditors. Extraneous proof might
have been offered, in the absence of such a stipula-
tion in either deed, *that the grantor had ample prop-
erty* to pay his debts and the chancellor would have
canceled the conveyances.

Suppose, however, an assignment is made declaring
the insolvency of the debtor and his purpose to have
his creditors share equally in his assets, but it appears
that the debtor said, at the time of its execution, he
made it to prevent creditors from suing him, and re-
quire them to purchase his property for more than its
value, or that he had forged a note on B, one of his
creditors, and he believed, unless he made the assign-
ment, B would prosecute him; that but for the fear
of a prosecution he would not make the conveyance.
Now ought the chancellor, at the instance of a creditor
in either instance, disregard an assignment placing all
on terms of perfect equality for the benefit of one
creditor, by reason of a motive or intention unknown
to any creditor, and communicated only to the confi-

dential friends and advisers of the debtors? Opinion after opinion may be found where the consideration is sufficient, and the creditors placed on terms of perfect equality, and still the assignment has been held fraudulent, because, on its face or by its very terms, the intent of the debtor is made manifest; as in the cases cited, where the debtor in his assignment says that he has an ample estate to pay his debts, but to prevent a sacrifice by creditors, he transfers his property for the benefit of all.

In those cases the intent to hinder is plain, and as a matter of law, from the recital, the assignments will be held fraudulent. So we see from those cases what is meant by cancelling a conveyance made to hinder and delay creditors, although it be made upon a good consideration, or for the just and equitable purpose of securing an equal distribution between creditors. Such intention must not only produce but enter into the execution of the instrument. Although the consideration is sufficient, if the intent to hinder and delay appears, the assignment will be disregarded. The mere declaration of the intent, or the purpose, or where devices have been resorted to in order to accomplish the intent, when no fact appears showing a hinderance or delay, but, on the contrary, it appearing there was neither, the chancellor will not long hesitate before pronouncing the act valid. There is no benefit reserved in this assignment to the debtors; nothing compulsory on the assignee or the creditors, the assignee being required to sell as soon as practicable and pay the debts. The hope, expectation, the motive, made known only to counsel and friends, cannot affect the rights of creditors.

If the rule of equity is applied as in the principal opinion, and the fraud practiced on creditors prior to the assignment, and traced to the day of its execution, is to affect creditors, to what extent is the doctrine to be carried? Can a debtor who has defrauded his creditor make a general assignment? If so, what mere motive or intent will defeat it? Every intent that is not innocent, but what, if carried out, would be unlawful, must, if this rule is established, be the guide. Innocent beneficiaries, whose rights are secured by it, must always be governed by the intent of the maker, although the act done is lawful. A field for judicial speculation is opened that, in my opinion, places the honest creditor at the mercy of the insolvent debtor, who, while he cannot prefer under the statute, may protect his favorite creditor by a general assignment, with a fraudulent intent that the latter may obtain his attachment and secure his debt. The barriers against fraud are removed and the dishonest invited to enter. The punishment inflicted on the maker of such an instrument is but what he invites and is willing to receive for the protection of his favored creditor. The innocent are made to suffer for the motive and intention of the wrong-doer, that forms no part of a contract that is legal, just and equitable to all.

I concede, as all the authorities say, that an intent to defraud, when established, avoids the assignment; but, says Mr. Burrill in his work treating of this subject: "In determining whether an assignment is or is not fraudulent against creditors, the question is said to be not whether fraud may be committed by the assignee, but whether the provisions of the instrument

are such that, when carried out according to their apparent and reasonable intent, they will be fraudulent in their operation." (Burrill on Assignments, section 35.)

What is the assignee required to do under the assignment in this case? He is to sell the property in a reasonable time, and divide the proceeds between creditors. No felony has been compounded or criminal prosecution abandoned, but, on the contrary, as appears from the record, no such proposition would be listened to by creditors, and the debtors sought refuge from prosecution in going to the Dominion of Canada. That the debtors defrauded the appellant, as well as many other banks, who are now, claiming an equal distribution with it, is evident. That they delayed and postponed the time for making the assignment by false promises in order, to accomplish their purpose, which was to avoid a prosecution, is equally manifest; but while this fraud and delay and false promises affected one creditor as much as another, in what manner did an assignment for the benefit of every creditor Payne & Viley had, hinder, delay and defraud creditors in the collection of their debts? They may have defrauded them by constant promises to pay, and delayed the bringing of any action against them for the purpose of making the general assignment; but at last, in what manner is this assignment fraudulent in its operation, and in what respect does it hinder and delay creditors? The response must be that it neither hinders, delays or defrauds creditors, and is just such a distribution of the assets as the debtors should have made, and such as the law required them to make.

Payne & Viley had .divested themselves of all title to the property. The estate was in the hands of an assignee for the benefit of those entitled to it. The delay was only such as pertains to every ordinary assignment, and the fact that the debtors believed that this one apparent evidence of honesty would appeal to the mercy of wronged creditors, affords no reason in law, equity or justice, for the interference of the chancellor and the cancellation of the assignment.

"Assignments must be absolutely and fairly made for the genuine purpose of paying honest debts, and not for the use and benefit of the grantor, or to hinder and delay creditors." (State v. Benoist, 37 Mo., 500.) This is a correct rule, but it does not mean that, if made with the intention merely to use it for the benefit of the grantor to accomplish some vicious purpose, that it is fraudulent as to creditors who are not parties to the wrongful intent. The assignment is for the benefit of all creditors. It vests the assignee with the absolute title, and no right to use it for a bad purpose exists with the grantor without the assent of the beneficiaries in the deed ; and when that assent is obtained, or the right of the creditor to the property or its proceeds is made to depend on the exercise of such a use by the grantor, the instrument is then fraudulent and void.

Prior to the act of 1856 a debtor in this State, although insolvent, could, in good faith, secure one creditor in preference to all others. Now suppose, as the law then existed, the debtor had secured an honest debt to a *bona fide* creditor, the security being fair and reasonable in its terms, but it appeared that the intent of the debtor was to secure the one creditor, so as to

force a compromise with the other creditors by which they could be induced to take less than the real amount of their debts. This intent is unknown to the secured creditor, but he stands innocent of any wrong. Now, will it be maintained that the deed is fraudulent as to this creditor, because of the improper use the debtor proposes to make of it? Surely not.

In the investigation of this case, since the original opinion was delivered, I have read the case of Marbury v. Brooks, reported in 7 Wheaton, 556, the opinion delivered by Chief Justice Marshall, a case bearing a striking analogy to the case before me, and one not before the court when this case was considered. Fitzhugh had executed his notes for large sums of money in December, 1819, and forged the names of certain parties as indorsers of the paper, and then discounted the notes in certain banks. Fitzhugh being unable to meet the paper at maturity, with a view of pacifying the banks, executed to one Marbury a deed to valuable property for the benefit of the defrauded creditors, they to be first paid, and the balance, if any, to go to the unpreferred creditors. Fitzhugh then fled the country, and the unsecured creditors obtained their attachments that were levied on the property.

They contended that the consideration of the conveyance was illegal because executed for the purpose of suppressing a prosecution by the banks for the felony. The testimony in the case, says the great jurist, "was abundantly sufficient to justify the jury in drawing the inference that the deed was executed by Fitzhugh in the hope that payment of the forged

notes would enable him to escape a prosecution, and that the same hope was entertained by Marbury, the assignee.''

The jury, at the instance of the banks, was in substance instructed by the court below ''that if this purpose or motive on the part of Fitzhugh and Marbury was unknown to the banks, and accepted by them without any agreement, express or implied, to suppress or forbear the prosecution of Fitzhugh, they must find for the banks.'' This instruction was excepted to, and the creditors asked the following instruction: ''That if from the evidence the jury believed that the deed was devised and executed by Fitzhugh, and procured and accepted by Marbury, with the motive and intent and for the purpose and object of suppressing a prosecution against Fitzhugh by prevailing with the holders of the forged notes to forbear and forego a prosecution for the forgeries, that then the deed is fraudulent and void in law as to the plaintiffs.'' The instruction was refused. The Chief Justice, in discussing this last instruction, says in substance that it is of doubtful meaning, and if confined to the stipulations of the deed, is in conflict with the instructions given for the banks. ''But if counsel is to be understood as asking the court to say, that if the deed was to be used by Marbury as an instrument by which to procure the suppression of the prosecution, that being the condition on which the holders of the forged notes were to entitle themselves to its advantages, it was fraudulent and void as to the plaintiff, there can be no doubt but that the instruction should have been given,'' etc.

The counsel for the plaintiffs also asked the court to instruct the jury "that if the great majority of creditors in number and value of said Fitzhugh were by means of said deed unjustly and purposely hindered, delayed and defeated in their proper suits and remedies for the recovery of their debts on the absconding Fitzhugh, and that the deed was executed with the purpose of defeating all legal recourse in behalf of the unsecured creditors against the property of Fitzhugh, then the deed is fraudulent and void." This instruction was refused, and for the reason that the debtor had the right to prefer one creditor over another. In discussing the facts of that case the Chief Justice said: "This act was entirely consistent with law. His right to give the preference is not questioned, nor is the validity of the consideration, so far as it moved from creditors infected with any vicious principle, or in any manner brought in doubt. Every thing on the part of creditors is exceptionally fair and legal."

The case cited meets directly the question of motive and intent, where the act done is lawful, and the intent alone of the grantor when executing it is vicious. Here the creditors connived at no fraud or vicious act on the part of the debtor. They were innocent in their acceptance of a writing lawful on its face, just and equal to all, of any impure motive on the part of the maker.

Creditors are entitled to demand equality when their debtor is insolvent and undertakes to make provision for them.

The principle recognized in Marbury v. Brooks should apply with greater force in this case, because

there a certain class of creditors were preferred; but here all are placed on an equal footing.

The legislation of this State affords a guide to the chancellor when called on to determine the validity of such assignments. The statute in regard to fraudulent conveyances is not only in force, but by section 1 of article 2, same chapter, it is provided, "that every sale, mortgage or assignment made by debtors, and every judgment suffered by any defendant, or any act or device done or resorted to by a debtor in contemplation of insolvency, and with the design to prefer one or more creditors to the exclusion in whole or in part of others, shall operate as an assignment and transfer of all the property and effects of such debtor, and shall inure to the benefit of all his creditors."

Insolvent debtors in their effort to secure creditors often gave priority by mortgage and assignments to those more vigilant than others, and to prevent such a preference, and place all creditors on terms of equality, when the insolvent debtor attempted to prefer, by any plan or device whatever, it was provided that such a preference should, by operation of law, pass the whole of the debtor's estate to his creditors.

The law makes the assignment for him, and all are permitted to share equally in the assets, subject to existing liens, or such as are given by the statute. The securing of one creditor by the debtor when in this insolvent condition has been held by this court, in repeated decisions, to evidence his design to prefer.

So in July, 1884, or at the time the assignment was made, and long before, these insolvent debtors could have made no preference between creditors without

being guilty of constructive fraud, and passing their whole estate to all creditors.

The limitation to a proceeding for constructive fraud in such a case is six months, and if assailed by a creditor within that time the chancellor would have said to Payne & Viley, you have violated the statute by giving a preference, and I will now do what you should have done, pass your whole estate in the hands of a trustee or commissioner for the benefit of all your *bona fide* creditors. So these debtors could secure no creditor or make terms with any, because it would have resulted in an assignment to all; but when they make an assignment to all, they are then told that the intent was vicious, and, therefore, the doctrine of equality is disregarded, and the attaching creditor is at last given the preference over all others. Payne & Viley occupied the anomalous position of being unable to secure one creditor, and in their condition unable to secure all alike.

They had progressed so far with their fraud and their vicious motives leading to the assignment that no act, however lawful, done by them, could be free from the taint of fraud or corrupt intent. The policy and wisdom of the Legislatute pointed out to the debtors the path they were to pursue in their deplorable condition, and while they may have obscured it in being prompted by an unlawful motive, the act itself being lawful, innocent parties will hold under it. Every principle of law, justice and equity will sanction the act, while no judge or chancellor can approve the motive prompting its execution. Other questions have arisen about which a difference of opinion

exists, but I am content to confine my views of the case to the principal question involved.

My individual opinion is, although not necessary to the decision of this case, that no general assignment can in any case be held fraudulent by reason of the equities of the statute in regard to preference, unless the creditors or some of them participate in the fraud.

In the case of Bancroft v. Blizzard, 13 Ohio, 40, 41, under a statute similar to ours, the court below instructed the jury that if the conveyance in trust was made by the debtor with a fraudulent intent it was void, although neither trustee or creditor participated in the fraud. This was held to be erroneous, one judge dissenting, the court saying: "Naked justice between creditors consists in an equal distribution of the debtor's property among all in the same proportion. If a debtor appropriates his property in a manner most consistent with the statute law and the principles of equity, and with the demands of pure justice, the validity of the transaction should not be impaired, although his intentions are fraudulent. The act is right, although the motive may be wrong. Conformably with this doctrine, it has been often held that a purchase by an honest purchaser is not tainted by the fraudulent intent of the vendor."

In the case of Emerson v. Senter, reported in 118 U. S., 3, the Supreme Court, through Mr. Justice Harlan, said: "If the intentional omission by the grantor of certain property from his schedule, and his appropriation of it to his own use, was such a fraud as would vitiate the deed when the assignee or the preferred creditors have previous notice of such omission, that

result can not happen when they were ignorant of the fraud at the time they accepted the benefit of the conveyance."